ACE & COMPANY, INC., Plaintiff,

v.

BALFOUR BEATTY PLC and BICC Cables Corporation, Defendants.

Civil Action No. 00–667–SLR.

United States District Court, D. Delaware.

June 28, 2001.

Vincent A. Bifferato, Jr., Bifferato, Bifferato & Gentilotti, Wilmington, DE, Harry L. Manion III, Paul F. Beckwith, John T. Hugo, Kenneth J. Martin, Cooley Manion Jones LLP, Boston, MA, for plaintiff.

Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Gary D. Friedman, Hector Gonzalez, Joseph De Simone, Heather W. Lane, Mayer Brown & Platt, New York City, for defendants.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

Defendants Balfour Beatty plc ("Balfour") and BICC Cables Corporation ("BICC") have moved to dismiss the com-

plaint filed in this action pursuant to Fed. R.Civ.P. 12(b)(2) and 12(b)(6). Plaintiff ACE & Company, Inc. ("ACE") filed suit against defendants alleging breach of contract. Defendant Balfour is a limited liability corporation incorporated in England and Wales. Defendant BICC is a corporation organized and existing under the laws of the State of Delaware. Plaintiff ACE is a Massachusetts corporation with its principal place of business in Wellesley, Massachusetts. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

For the reasons that follow, the motion to dismiss shall be granted in part and denied in part.

## II. BACKGROUND

ACE acts as an industrial manufacturer's representative and consultant. STRAN Technologies ("STRAN") is a division of ACE which manufactures fiberoptic connectors, fiber termini, and sub-assemblies used in the cable business.

Defendant Balfour is an international corporation with many different lines of businesses. Defendant BICC is indirectly owned by Balfour through a series of British and American subsidiaries. BICC's business is the production, manufacture and distribution of wire and cable in North America. One of BICC's divisions, BICC Brand–Rex Company ("Brand–Rex"), deals with the production and sale of custom engineered cables.

On or about October 10, 1997, Brand–Rex entered into two contracts with ACE: 1) the Sales Representative Agreement ("Sales Agreement"); and 2) the Connector Development, Manufacturing and Distribution Agreement ("Connector Agreement"). The Sales Agreement was written on BICC letterhead and provided for the appointment of ACE as Brand–Rex's "manufacturer's representative to solicit orders for the purchase of" certain designated Brand–Rex products in certain designated product markets. (D.I. 1, Ex. 3 at Art. 2(a)) The Sales Agreement also provided that "either party may terminate this Agreement during the Initial Term without cause effective after sixty (60) days prior written notice to the other." (*Id.* at Art. 1(c)) Further, the Sales Agreement stated that, "[i]n the event Brand–Rex decides to divest [itself] of its cable assembly business, or [ACE] decides to sell control of its business, each party shall have the right to match any bona fide offer for such business of the other and, upon exercising the right to match, such party shall be entitled to purchase such business at the terms of such offer." (*Id.* at Art. 5(b)) Finally, the Sales Agreement stated that it could be modified "only by a written amendment executed by both parties." (*Id.* at Art. 11(a))

The Connector Agreement provided, among other things, that ACE would design, develop and manufacture electronic and fiber connectors through STRAN for exclusive sale to Brand–Rex's cable assembly division. The Connector Agreement also provided that, "[i]n the event BICC Brand–Rex decides to sell or otherwise divest itself of its cable assembly business or ACE decides to sell control of its manufacturing business, each party shall have the right of first offer to acquire the other's business interest. The parties further agree to negotiate the terms of such an acquisition in good faith." (D.I.1, Ex. 2, Art. 11.4) As did the Sales Agreement, the Connector Agreement stated that it could be modified "only by a written amendment executed by both parties." (*Id.* at Art. 11.8)

On or about May 28, 1999, defendant

Balfour[1] consummated a complex, worldwide sale to General Cable Corporation of substantially all of Balfour's energy cable operations, including BICC, Brand–Rex and Brand–Rex's cable assembly division. Prior to the May 28, 1999 closing, BICC sent to ACE a form of consent to assign its contracts to the purchasing corporations. The form was executed on behalf of ACE. (D.I.8, Ex. A)

The transaction closed on May 28, 1999. At that time, the assets of BICC, including its Brand–Rex division, were sold to General Cable Corporation. In August 1999, ACE and the new entity created by the transaction, BICC General Cable, signed a new sales representative agreement. ACE no longer receives any benefits or rights from BICC General Cable under the Sales Agreement or Connector Agreement between ACE and BICC. In July 2000, ACE commenced this litigation alleging breach by defendants of the Sales and Connector Agreements by defendants' failure to honor the "right of first offer" provisions in each of said agreements.

## III. DISCUSSION

### A. Lack of Personal Jurisdiction

#### 1. Standard of Review[2]

■ Defendant Balfour moves to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(2) for lack of personal jurisdiction. Although ACE is entitled to have all reasonable inferences drawn in its favor, it bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over defendant Balfour. *See Applied Biosystems, Inc. v.*

*Cruachem, Ltd.,* 772 F.Supp. 1458, 1462 (D.Del.1991). To satisfy this burden, ACE must present facts which "establish with reasonable particularity" that defendant Balfour is amenable to service of process under Fed.R.Civ.P. 4(e)(1) and the Delaware long-arm statute, 10 Del.C. § 3104(c). *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996). If service of process can be accomplished, ACE must further demonstrate that an assertion of jurisdiction would comport with constitutional notions of due process. *See Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293 (3d Cir.1985).

■ The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent, "[t]ransacts any business or performs any character of work or service in the State." 10 Del.C. § 3104(c)(1). Section 3104(c)(1) has been characterized as a "single act statute" which allows the court "to exercise jurisdiction over nonresidents on the basis of a single act done or transaction engaged in by the nonresident within the state." *Eudaily v. Harmon,* 420 A.2d 1175, 1180 n. 4 (Del.1980).

■ The long-arm statute has been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents a means of redress against those not subject to personal service within the State." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156–57 (Del.Super.1997). Under the case authorities, however, the mere fact that a non-Delaware corporation owns a Delaware

---

1. Balfour is the successor-in-interest to BICC plc, a limited liability corporation incorporated in England and Wales. At the time of this transaction, Balfour was still called BICC plc.

2. Although defendants, in their moving papers, addressed all of the provisions of 10

Del.C. § 3104(c), the court will only discuss the provision argued by plaintiff in its responsive papers, 10 Del.C. § 3104(c)(1), on the assumption that plaintiff has conceded lack of jurisdiction under the remaining provisions of the statute.

subsidiary is not sufficient in itself to justify Delaware's exercise of personal jurisdiction over the non-Delaware parent. *See Papendick v. Robert Bosch GmbH*, 410 A.2d 148, 152 (Del.1979).

### 2. Analysis

Plaintiff ACE contends that defendant Balfour has had

> numerous contacts with Delaware and regularly took advantage of the benefits and protections of Delaware. Specifically, [Balfour] incorporated its wholly owned subsidiary, BICC, under Delaware law. [Balfour] repeatedly re-registered BICC as a Delaware Corporation for approximately 16 years. Most importantly, [Balfour] sold the assets of that Delaware Corporation (BICC) to another Delaware Corporation (BIC-CGeneral Cable) .... Since [Balfour's] conduct in Delaware, i.e., the sale of its Delaware company, is the source of the claim at issue, the exercise of jurisdiction over [Balfour] is proper.

(D.I. 16 at 11) In support of the above proposition, ACE has cited to numerous cases where Delaware courts have exercised personal jurisdiction over foreign parent corporations that have formed Delaware subsidiary corporations for the purpose of engaging in the transaction at issue in the case. For instance, in *Papendick*, plaintiff sued a German corporation ("RB") and its wholly-owned subsidiary, a Delaware corporation ("RBNA"), in order to recover a finders fee based upon the purchase by RBNA of the stock of a third corporation ("B–W"). RB was the parent company of the "so-called 'Bosch Group'" which encompassed some 90 wholly-owned subsidiaries and affiliates by which RB did business throughout the world. The Delaware Supreme Court noted that RB's products had been sent into Delaware and that RB had derived substantial revenues from sales of its products in Delaware by wholly-owned subsidiaries managed by RBNA, the Delaware subsidiary. In finding that there were "significant contacts between RB, the State of Delaware, and the litigation," the Delaware Supreme Court observed:

> RB came into the State of Delaware to create, under the Delaware Corporation Law, a subsidiary corporation **for the purpose of implementing its contract with B–W and accomplishing its acquisition of B–W stock.** RB utilized the benefits and advantages of Delaware's Corporation Law for the creation of RBNA to be the vehicle for channeling to B–W the purchase money for the B–W stock and for becoming the recipient of the B–W stock. It is reasonable to assume that RB saw benefits and advantages in purposefully selecting the State of Delaware and utilizing its laws, above all others, for the creation of RBNA in the execution of its agreement with B–W. We conclude that RB's ownership of RBNA stock was the result of RB's purposeful activity in Delaware as an integral component of it total transaction with B–W to which the plaintiff's instant cause of action relates.

*Papendick*, 410 A.2d at 152 (emphasis added). *See also Friedman v. Alcatel Alsthom*, 752 A.2d 544, 550 (Del.Ch.1999) (in action alleging violations of federal securities laws by a French company in connection with a merger between its Delaware subsidiary and an American corporation, conclusion that, "[b]y creating a Delaware subsidiary to effect the merger at issue, Alcatel's 'single act' in Delaware is sufficiently linked to the source of this claim to permit this Court to exercise jurisdiction over Alcatel for the purposes of this action"); *Kahn v. Lynch Communication Systems, Inc.*, No. 8748, 1989 WL 99800, at *3–4 (Del.Ch. Aug.24, 1989) (stating that because a nonresident corporation "was

directly involved in the allegedly wrongful conduct that resulted in the merger" under attack in the suit, the facts were sufficient to establish that the nonresident corporation, "directly, or through its subsidiary, transacted business in Delaware"); *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 966 (Del.Ch.1986) (holding that nonresident corporation had the requisite minimum contacts with Delaware where it chose to incorporate a Delaware subsidiary and, through that subsidiary, avail itself of Delaware law to effectuate the merger attacked in the litigation).

Likewise, in *Sternberg v. O'Neil*, 550 A.2d 1105 (Del.1988), the Delaware Supreme Court explained that "[i]n order to support an exercise of specific jurisdiction, the nonresident defendant's minimum contacts with the forum must give rise to the particular controversy.... Thus, whether the requisite minimum contacts exist is determined by examining the relationship between the defendant, the forum and the litigation." *Id.* at 1118. The particular controversy at issue in *Sternberg* was a "double derivative suit" brought by plaintiff ("Sternberg") against an Ohio corporation ("GenCorp"), its wholly owned subsidiary ("RKO General", a Delaware corporation), and certain past and present officers and directors of both corporations. As noted by the Court, "[o]ne aspect of the suit alleges mismanagement and breaches of fiduciary duty on the part of the directors of RKO General, the Delaware corporation, resulting in detriment to that corporation and therefore to GenCorp, the sole stockholder of the Delaware corporation." The Court found that,

> [f]or more than thirty years, GenCorp has benefited from the protections of the Delaware law in operating RKO General for commercial gain, including the benefits afforded to it directly as a shareholder of a Delaware corporation. We

conclude that GenCorp intentionally established and maintained minimum contacts with Delaware by its decision to continue to operate its wholly owned subsidiary, RKO General, as a Delaware corporation.

*Id.* at 1122. The Court went on to analyze whether the assertion of personal jurisdiction would comport with fair play and substantial justice. The Court decided that it was "reasonable for Delaware to exercise jurisdiction in this double derivative law suit" because

> Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of its domestic corporations.... Delaware has an obligation to provide such a forum. All 'traditional notions of fair play and substantial justice' would be offended if Delaware permitted GenCorp to use its laws to maintain a Delaware subsidiary and then declined to exercise jurisdiction over GenCorp in a double derivative suit, where GenCorp was an indispensable party.

*Id.* at 1125.

■ The litigation at bar is distinguishable from those cases cited above. Clearly, BICC was not created for the purpose of consummating the transaction at issue. According to the affidavits of record, Balfour did not wholly own BICC, was not the entity that incorporated BICC, and neither negotiated nor consummated the sales transaction in Delaware. (D.I. 8, Exs. C, D; D.I. 18) Indeed, BICC did not have offices, plants, facilities, or other assets located in Delaware at the time of the sales transaction. (D.I.18) The mere fact that BICC is a Delaware corporation is not sufficient to confer personal jurisdiction over Balfour, at least in the context of a contract action (as opposed to a sharehold-

er derivative action, as discussed in *Sternberg* ).

 Neither do the facts justify an assertion of personal jurisdiction under either the agency theory or the alter ego theory. "In Delaware, to reach a parent corporation under the alter ego theory, the party asserting jurisdiction must establish some fraud, injustice, or inequity in the use of the corporate form." *C.R. Bard, Inc. v. Guidant Corp.*, 997 F.Supp. 556, 559 (D.Del.1998). ACE's contention that "it appears likely that BICC will not have the assets to satisfy any judgment rendered against it" is unsupported factually and insufficient legally.

 With respect to the agency theory, ACE argues that BICC is Balfour's agent because Balfour "made the decision to sell BICC's assets." (D.I. 16 at 14) The agency theory requires not only that the precise conduct shown to be instigated by the parent be attributable to the parent, *see id.* at 560, but also that such conduct satisfy § 3104(c)(1); i.e., that the jurisdictional conduct take place in Delaware. Because BICC owned no assets in Delaware and the sale of its assets was negotiated and consummated outside of Delaware, there is no jurisdictional conduct to attribute to Balfour. Therefore, Balfour is not subject to the assertion of personal jurisdiction by this court pursuant to § 3104(c)(1).

## B. Failure to State a Claim

### 1. Standard of Review

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if,

after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### 2. Analysis

#### a. Breach of Contract

 "It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992). Only if the language of the contract is ambiguous so that a literal reading would lead to unreasonable or arbitrary results may a court look to collateral sources to ascertain contractual intent. *See id.*

 Defendant BICC argues in this regard that "the alleged rights under the [Agreements] were never triggered by the sale of the assets of" BICC to General Cable in May 1999. (D.I. 8 at 21) And, indeed, the literal language of the Agreements refers only to a situation in which "Brand–Rex decides to sell or otherwise divest itself of **its cable assembly business.**" (D.I.8, Ex. 3) (emphasis added) BICC asserts that Brand–Rex is still in the cable assembly business, albeit as a member of the General Cable family of companies rather than as a division of BICC; therefore, the right of first refusal has not been breached.

The court concludes, however, that there are genuine issues of material fact regarding the legal status of Brand–Rex and whether the sale of BICC's assets (includ-

ing Brand–Rex) to General Cable triggered the right of first refusal provisions under the Agreements at issue.

#### b. Waiver, Acquiescence, Estoppel

 The court likewise concludes that there are genuine issues of material fact as to whether ACE intentionally relinquished its right of first refusal or is otherwise barred from pursuing its claim through acquiescence or estoppel. *See, e.g., Arnold v. Soc'y For Sav. Bancorp, Inc.,* 650 A.2d 1270, 1289 (Del.1994) ("The standard for finding waiver in Delaware is quite exacting."); *Vechery v. Hartford Accident & Indem. Ins. Co.,* 121 A.2d 681, 685 (Del. 1956) ("To constitute a waiver the right alleged to have been waived must have been known to the person to be charged therewith and his waiver thereof must have been intentional. Such intention will not be implied from slight circumstances.").

#### c. Rule Against Perpetuities

 Assuming for purposes of this proceeding that the rule against perpetuities (versus the rule against alienation, *see Tracey v. Franklin,* 67 A.2d 56 (Del.1949)) is applicable to personal property, the court concludes that a commercial contract with an initial ten-year term followed by optional renewal periods of five years does not violate the rule against perpetuities.[3] (D.I.16, Exs.E, F)

#### d. Implied Covenant of Good Faith and Fair Dealing

 Defendant BICC argues that ACE has failed to allege the essential elements of a claim for breach of the implied covenant of good faith and fair dealing, to wit, "arbitrary or unreasonable conduct

---

**3.** Although the court does appreciate the opportunity to revisit the rule in a practical

which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Cantor Fitzgerald, L.P. v. Cantor,* No. 16297, 2000 WL 307370, at *15 n. 51 (Del.Ch. March 17, 2000) Under the "notice pleading" requirements of Fed.R.Civ.P. 8(a), however, the court concludes that the allegations sufficiently plead failure on the part of BICC to adhere in good faith to its contractual obligations and to deal fairly with ACE in the transaction at issue. *See R.J. Assocs., Inc. v. Health Payors' Org. Ltd. P'ship, HPA, Inc.,* No. 16873, 1999 WL 550350, at *9 (Del.Ch. Jul.16, 1999).

### IV. CONCLUSION

For the reasons stated, defendants' motion to dismiss is granted in part and denied in part.

An appropriate order shall issue.

context (versus an academic context).